## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mary Egbertson as trustee for the next-
of-kin of Nathan A. Nieber, Deceased,

        Plaintiff,

v.

Ronald L. Halverson and Michael L. Wehking,

        Defendants.

_____

Mary E. Egbertson as trustee for the next-
of-kin of Nathan A. Nieber,

        Plaintiff,

v.

United States of America,

        Defendant.

_____

Michael L. Wehking and Kathy Wehking,

        Plaintiffs,

v.

Ronald L. Halverson,

        Defendant.

_____

Angela K. Amundson, Judith A. Berg, and
Scott D. MacDonald,

        Plaintiffs,

### REPORT AND RECOMMENDATION

Civil No. 05-466 (JNE/SRN)

Civil No. 04-5066 (JNE/SRN)

Civil No. 05-863 (JNE/SRN)

v.                                          Civil. No. 05-004 (JNE/SRN)

United States of America,

       Defendant.

---

Michael L. Wehking and Kathy Wehking,

       Plaintiffs,

       v.                                   Civil No. 05-070 (JNE/SRN)

United States of America,

       Defendants.

---

Sharon Van Dyck, on behalf of Plaintiff Mary Egbertson

Gregg Nelson, on behalf of Plaintiffs Michael L. Wehking and Kathy Wehking

Walter Sawicki, on behalf of Plaintiffs Angela K. Amundson, Judith A. Berg, and Scott D. MacDonald

Perry Sekus, Assistant United States Attorney and John Brossart, Minnesota National Guard Staff Judge Advocate, on behalf of Defendant United States of America

---

SUSAN RICHARD NELSON, United States Magistrate Judge

       The five above-captioned cases came before the undersigned magistrate judge on May 18, 2005 on nine motions.  In Egbertson v. Halverson, et al., Civ. No. 05-466 (hereinafter Egbertson I), the Court heard Defendants' Motion for Substitution (Doc. No. 2), Defendants' Motion to Dismiss (Doc. No. 7), and Plaintiff's Motion for Review of U.S. Attorney's Certification, for Discovery, and/or for an Evidentiary Hearing, and for Remand (Doc. No. 20).  In Egbertson v. United States, Civ. No. 04-5066 (hereinafter Egbertson II), the Court heard Defendant's Motion to Dismiss (Doc. No. 8).  In

2

Wehking et. al. v. Halverson, Civ. No. 05-863 (hereinafter Wehking I), the Court heard Defendants'

Motion for Substitution (Doc. No. 2), Defendants' Motion to Dismiss (Doc. No. 6), and Plaintiffs'

Motion for Review of U.S. Attorney's Certification, for Discovery, and/or for an Evidentiary Hearing,

and for Remand (Doc. No. 10).  In Amundson et. al. v. United States, Civ. No. 05-004 (hereinafter

Amundson II), the Court heard Defendant's Motion to Dismiss (Doc. No. 8).  Finally, in Wehking et.

al v. United States, Civ. No. 05-070 (hereinafter Wehking II), the Court heard Defendant's Motion to

Dismiss (Doc. No. 5).  The above motions have been referred to the undersigned United States

Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local

Rule 72.1(c).

　　　For the reasons set forth below, this Court recommends that Defendants' motions be denied

without prejudice and that Plaintiffs' motions be granted in part and denied without prejudice in part.

The Court grants leave to conduct discovery aimed at resolving the issues enumerated below.

## I.    BACKGROUND

### A.    Facts As Alleged by Plaintiffs[1]

　　　All of the above-captioned cases stem from the same July 3, 2002 boat crash that killed one

member and injured several other members of the Minnesota National Guard.  As of the date of the

---

[1] The parties have submitted and the Court may appropriately consider matters outside the
pleadings in rendering its decision upon a Federal Rule of Civil Procedure 12(b)(1) or 56 motion.
Osborn v. United States, 918 F.2d 724, 728 n.4 (8th Cir. 1990) ("The district court has authority to
consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule
12(b)(1)."); Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment
as a matter of law.").

crash, all of the individual Plaintiffs and Defendants were members of the Minnesota National Guard who worked as full-time support (FTS) staff at the Division Headquarters.

Prior to July 3, 2002, at the direction of Colonel Ronald L. Halverson (Halverson), Major Michael L. Wehking (Wehking) drafted a document entitled, "Operation Flotilla Alpha 2002." (M. Wehking Aff. ¶ 8.) The document consists of three pages of text and two maps. The text reads as follows:

UNCLASSIFIED

OPERATION FLOTILLA ALPHA 2002
Reference: See St. Croix River Map (Not to Scale)
Time Zone Used throughout the Plan: SIERRA
Task Organization: ALL Rosemount TACC FTS (no significant others due to lack of boat space).

1.   SITUATION.
     a.   Enemy Forces.  None in Area of Responsibility (AOR).
     b.   Friendly Forces.  Rosemount FTS.
     c.   Attachments and Detachments.  None.

2.   MISSION.
      Rosemount TACC FTS conduct Reconnaissance in Force of St. Croix River Waterway vicinity Stillwater-Hudson-Afton areas, from 0900-1600 Wednesday, 3 July 2002. Special Emphasis on team building, volleyball, getting tans and participating in waterborne operations not normally associated with this unit.

3.   EXECUTION.
     a.   Concept of Operation. FTS will assemble at COL Halverson's house in two waves (See Directions at Annex A). The first wave arrives NLT 0800 and are those who desire to participate in a 40-minute morning run followed by a swim (shower) in the river; the second wave arrives NET 0900 and NLT 0915 and are those who just prefer to start their day out with Class VI/Coffee, bagels. After a one-hour session on Halverson's commanding high ground, the team will move via POV to Hudson, Wis along route Wild to prepare for boat launch at Hudson Public Launch. The Detachment Left in Contact (DLIC) will ferry the At Ease Halverson

4

watercraft to the linkup point.  FTS will park POVs vicinity Public Boat Launch and move out on the pier, arriving at Red Bull beachhead (see Map).  Beachhead also known as Hudson Public Beach and our element will occupy and play volleyball and other assorted fun games from 1000-1200.  At 1200, the team will walk up the hill to Dick's Bar for your lunch of choice.  Starting at 1300, the 3-4 boat Flotilla River Trip will cruise the St. Croix.  All FTS will arrive back at the beachhead NLT 1600 to facilitate movement to Home of Record.

b.      Task to Subordinate Sections.

(1)      Command Group: Halverson provides Champagne and OJ; Wehking provides Bloody Mary elements; Fleming and Amundson ensure quality coffee and bottled water.

(2)      G-1/HHC: Brings munchies for Beach Party and ensures we have volleyball net with ball and bocce ball setup.

(3)      G-2/MI: Brings Bagels with cream cheese.

(4)      G-3/Band: Brings 8-gallon keg with tap[], can to contain and plastic cups for beachhead occupation.  Hudson has a liquor store that is close.

(5)      G-4/MP: Ensure sun screen, cameras, ice, garbage bags.

(6)      FTG: Pyrotechnics to celebrate the 4th (they are legal in Wisconsin)

c.      Coordinating Instructions.

(1)      Uniform is civilian river attire.

(2)      Cell Phone commo plan is in Command/Signal.

(3)      Late comers arrive at Red Bull Beachhead.

(4)      Sections get headcount to SFC Amundson NLT 021200 Jul 02.

(5)      You must Park on [Street name] Ave just behind the entrance to COL Halverson's house (you have to walk 1/8th mile) (See map)

(6)      Skiing and tubing will be available.  At your own risk.

4.      <u>SERVICE SUPPORT</u>.  Covered in Tasks to Subordinate Sections.

5.      <u>COMMAND AND SIGNAL</u>.

a.      Command

(1)      COL Halvorson's Boat "AT Ease" is C2.

(2)      Support Craft operated by Knoblach (Scarab) and Wehking (Tyee) will round out the flotilla.  Any other boaters advise Wehking NLT 021200 July 02.

b.      Signal.

(1)      Cell Phone Commo Plan is:

5

Halverson [Phone number]
Halverson Home: [Phone number]
Wehking [Phone number]
Amundson [Phone number]
Knoblach [Phone number]

6.    SAFETY.
a.    Do not drink and drive.
b.    Bring a life jacket if you have one.
c.    Hydration is critical (Class VI is no substitute)
d.    Speed Can kill -- follow posted speed limits in boats.

ACKNOWLEDGE:
HALVERSON
COL

OFFICIAL:
/s/
Wehking
SGS

(Doc. No. 28 Ex. C in Egbertson I.)  Plaintiffs allege that the above document "was not intended to

have military significance" but was instead a party invitation.  (Doc. No. 17 at 5-6 in Egbertson II).

Plaintiffs claim the "Operation Flotilla" document was distributed informally and only about eight of the

intended participants actually received it.  (Id.)  The "operation" went forward as scheduled on July 3,

2005.  Plaintiffs allege, and the United States concedes, that none of the relevant activities on July 3,

2002 occurred on government property (Id. at 6-9; Doc. No. 10 at 12 in Amundson II.)  A substantial

part of the events of the day took place at Halverson's House, a public beach, a private bar, and on

boats piloted on the lower St. Croix River.  (Id.)  Approximately forty members of the Minnesota

National Guard were present for "Operation Flotilla" at some point in the day.  (Id. at 1, 7.)  According

to the United States, approximately seventy FTS staff work at Division Headquarters.  (See e.g., Doc.

6

No. 10 ¶ 3 in <u>Egbertson I</u>.)

According to Plaintiffs, only thirteen of the participants arrived at Halvorsen's home for the morning run.  (<u>Id.</u> at 7.)  Breakfast was served at Halverson's house and included beer, Mimosas, and Bloody Mary cocktails.  (<u>Id.</u>)  Some participants arrived as late as 11:00 a.m. when the group left Halverson's house after breakfast.  (<u>Id.</u>)  No roll call or attendance was taken.  (<u>Id.</u>)  No safety briefing was given.  (<u>Id.</u> at 2.)  Plaintiffs contend that after breakfast, participants were free to leave.  (<u>Id.</u> at 7.)

After breakfast, the events moved to a public beach near Hudson, Wisconsin on the St. Croix River (referred to as "Red Bull Beachhead" in the "Operation Flotilla" document).  (<u>Id.</u>)  Most of those that did not leave drove their own automobiles to the beach.  (<u>Id.</u>)  Once at the beach, the participants played volleyball, used a jet ski, water skied, swam, and sun bathed.  (<u>Id.</u> at 8.)  As planned, Halverson and Wehking arrived at the beach in their private boats.  (<u>Id.</u>)  Halverson had a thirty-two foot cabin cruiser and Wehking a 18.5 foot fishing boat.  (<u>Id.</u>)  Wehking arrived with two cases of beer pursuant to Halverson's request.  (<u>Id.</u>)  Sometime between noon and 1:00 p.m., half of the group went to a private bar for lunch where, in addition to food, several pitchers of beer and other alcoholic beverages were consumed.  (<u>Id.</u>)  Lunch ended about 2:30 p.m. and Halverson told a group of participants that they could leave.  (<u>Id.</u>)  A larger group of participants left at about 3:15 p.m.  There was no formal dismissal.  (<u>Id.</u>)

Shortly after 3:15 p.m., four or five of the remaining people boarded Wehking's boat and Wehking piloted them to an area near the Stillwater, Minnesota bridge where they swam, relaxed, and danced on the boat.  (<u>Id.</u> at 8-9.)  Halverson's boat was also moored near the same bridge.  (<u>Id.</u> at 9.)  Sometime between 4:00 p.m. and 4:30 p.m. Wehking piloted his boat back toward the public beach

landing in Hudson, Wisconsin  (Id.)  On board Wehking's boat were Sergeant Scott MacDonald

(MacDonald), Sergeant Judith Stain (now Berg), Sergeant First Class Angela Amundson (Amundson),

Major Amanda Digre (Digre), and First Lieutenant Nathan Nieber (Nieber).  (Id.)  Halverson's boat

was still moored near the bridge when Wehking left.  (Id.)  Wehking slowed his vessel in reaction to

turbulence in the river and water traffic.  (Id.)  Plaintiffs claim Halverson, who was piloting his cabin

cruiser behind Wehking's boat, was following too closely, failed to slow down, and overran Wehking's

boat from the rear.  (Id.)  The resulting collision killed Nieber and injured the other passengers in

Wehking's boat.  (Id.)

### B.    Administrative Claims and Procedural Posture of Cases

Plaintiffs in the above-captioned cases filed claims with the United States Department of the

Army for injuries suffered as a result of the July 3, 2002 boat crash.  (Doc. No. 1 Ex. A in Egbertson I;

Doc. No. 1 Ex. A in Wehking I; Doc. No. 1 Ex. A, B, and C in Amundson II.)  Mary Egbertson

claimed $500,000; Michael and Kathy Wehking claimed $221,400; Angela Amundson claimed

$250,000; Judith Berg claimed $500,000; and Scott MacDonald claimed $100,000.  (Id.) In letters

dated July 14, 2004, the Army denied each of their claims.  (Id.)  Each of the letters state, "Feres v.

United States, 340 U.S. 135 (1950) bars the claim if the service members involved in the accident

were within the scope of employment at the time of service."  (Id.)  The letters also state, "If [Plaintiffs]

were not within the scope of employment at the time of the accident, [Plaintiffs' claims are] personal

legal matter[s] between them and Colonel Halverson."[2]  (Id.)

---

[2] Plaintiffs contend they filed both state and federal suits in response to what they characterize
as the United States' "ambiguous denial"of their administrative claims.  (Doc. No. 22 at 2 in Egbertson

After the claim denial letters issued, Egbertson initiated a state negligence lawsuit against

Halverson and Wehking (Egbertson I) and concurrently filed a federal lawsuit alleging a violation of the

Federal Tort Claims Act (FTCA), codified at 28 U.S.C. §§ 2671-80 (2000), against the United States

(Egbertson II).  Michael and Kathy Wehking also initiated a state negligence suit naming Halverson

(Wehking I) and also concurrently filed a federal lawsuit alleging a violation of the FTCA against the

United States (Wehking II).  Amundson, Berg, and MacDonald similarly initiated a state lawsuit against

Halverson and Wehking and a federal action against the United States (Amundson II).

The Egbertson I and Wehking I cases were removed from state court to this Court.[3]  The other

three lawsuits now before the Court, the Egbertson II, Wehking II, and Amundson II cases, were

originally filed with the Clerk of the United States Court for the District of Minnesota.

The removed cases name individuals but not the United States as defendants.  The plaintiff in

Egbertson I alleges Defendants Halverson and Wehking negligently operated their motor boats

proximately causing the death of Nathan A. Nieber.  (Doc. No. 1 Ex. A in Egbertson I.)  After

removal, on March 2, 2005, United States Attorney for the District of Minnesota Thomas B.

Heffelfinger, pursuant to 28 U.S.C. § 2679(d)(1) and 28 C.F.R. § 15.3(a), certified that Halverson and

Wehking, "were acting within the scope of their employment as members of the Army National Guard

at the time of the alleged conduct in the Complaint."  (Doc. No. 5 in Egbertson I.)  Plaintiffs in Wehking

I allege that Plaintiff Michael L. Wehking sustained injuries and Plaintiff Kathy Wehking sustained a loss

of consortium as a result of Defendant Halverson's negligent operation of a motor boat.  (Doc. No. 1

I.)

---

[3] The Amundson, Berg, and MacDonald state case has not been removed to federal court.

Ex. A in <u>Wehking I</u>.)  After removal, on May 2, 2005, Acting United States Attorney for the District of Minnesota Robert M. Small, pursuant to 28 U.S.C. § 2679(d)(1) and 28 C.F.R. § 15.3(a), certified that Defendant Halverson "was acting within the scope of his employment as a member of the Army National Guard at the time of the alleged conduct in the Complaint."  (Doc. No. 4 Ex. B in <u>Wehking I</u>.)

Pursuant to 28 U.S.C. § 2679(d)(1) and 28 C.F.R. § 15.3(a), once the United States Attorneys certified that Defendants Halverson and Wehking were acting within the scope of their government employment,[4] the action was deemed brought against the United States.  Plaintiffs in both cases challenge the scope of employment finding made by the United States Attorneys, request that the individual defendants be reinstated, and that the Court remand the cases to state court or, in the alternative, that Plaintiffs be given the opportunity to conduct discovery and/or an evidentiary hearing on the scope of employment issue.

The United States moves the Court to dismiss all five of the above-captioned cases for lack of subject matter jurisdiction pursuant to the doctrine set forth in <u>Feres v. United States</u>, which excepts from FTCA jurisdiction claims for "injuries to servicemen where the injuries arise out of or are in the course of activity incident to [military] service."  340 U.S. 135, 146 (1950).  Plaintiffs argue that the motion to dismiss is premature and further discovery should be allowed to determine if the <u>Feres</u> doctrine applies or that the motion should be denied outright because the evidence shows the subject activity was not incident to military service.

---

[4] This is sometimes called a <u>Westfall</u> certification, named after the case, <u>Westfall v. Erwin</u>, 484 U.S. 292, 300 (1988), the case that inspired the statutory provisions which authorize the certification.

## II.   PARTIES' POSITIONS[5]

### A.   <u>Scope of Employment</u>

The United States contends that everyone involved in the boat crash was acting "in the line of duty" on July 3, 2005 thus justifying its certification that Halverson and Wehking were all acting within the scope of their employment with the Minnesota National Guard.  (Doc. No. 28 at 2 in <u>Egbertson I</u>.)  In support of its position, the United States submits the affidavits of Halverson and Brigadier General Jon Trost, Assistant Adjutant General of the Minnesota National Guard.  (Doc. No. 28 Exs. A-B in 05-466.)

In his affidavit, Halverson states that "Operation Flotilla" was part of an "organizational day," a

---

[5] By the Court's count, the parties filed twenty separate briefs in connection with the motions now before the Court.  A number of these briefs adopt the arguments contained in other briefs either filed in the same case or in one of the other above-captioned cases.  Specifically, Defendants' memorandum of law in support of their motion to dismiss in <u>Wehking I</u> adopts the arguments made in their memorandum of law in support of their motion to dismiss in <u>Egbertson I</u>; Plaintiffs' response to Defendants' motion to dismiss in <u>Wehking I</u> adopts the argument of the plaintiff in <u>Egbertson II</u>, <u>Wehking II</u>, and <u>Amundson II</u> as to the same motion; Plaintiffs' response to Defendant's motion to dismiss in <u>Wehking II</u> adopts the arguments of the plaintiffs in <u>Egbertson II</u> and <u>Amundson II</u> in responding to the same motion; Plaintiffs' response to Defendants' Motion for Substitution adopts the arguments of the plaintiff in <u>Wehking I</u> as to the same motion, the response to which in turn adopts the arguments in the <u>Wehking I</u> plaintiffs' memorandum in support of their motion to review certification; and Defendants' response to Plaintiffs' motion to review certification adopts its position in response to same motion in <u>Egbertson I</u>.  At least in one instance, the parties' adoption practice appears to have led to some confusion.  For example, the Defendants in Wehking did not file a reply brief as concerns its motion to dismiss even though the Plaintiffs there did adopt by reference the arguments of the other above-captioned plaintiffs in response to that motion (<u>See</u> Doc. No. 10 Ex. 3).  In addition, at the motion hearing some of the plaintiffs adopted the arguments made on behalf of other plaintiffs.

The Court has thoroughly reviewed all of the briefing and oral arguments.  The arguments of the Plaintiffs do not differ materially and for purposes of the present motions, the Court construes the aggregate of Plaintiffs' briefing on each motion as if submitted by each plaintiff in each case.  Likewise, the Court construes the aggregate of the United States' briefing on each motion as if submitted in each case as applicable to each motion.

common military function in which an Army element or unit meets for recreation at a location other than

its normal duty station but which is considered a normal duty day.  (Id. Ex. A ¶¶ 3-4.)  He attests

further that the "reasonable and responsible use of alcohol has been permitted at organizational days in

the past."  (Id. ¶ 4.)  Halverson states that the July 2, 2002 event was intended to "recognize the efforts

of the soldiers that had been heavily engaged in preparing for the Bosnia deployment, to enhance

communications, and to maintain and improve morale."  (Id. ¶ 6.)  Halverson states that "[a]ll full-time

personnel assigned to the Division Headquarters were expected to attend [the July 3, 2002] event

unless they took annual leave or were required to report to another duty station.  (Id. ¶ 7.)  According

to Halverson, all persons attending the event were paid their regular duty pay (Id.) and did not need

special passes to attend the off-site event because it "was an official duty day."  (Id. ¶ 8.)  The

"Operation Flotilla" document was an operations order, and, according Halverson, "The Op. Order

was distributed to each of my section chiefs, and my expectation was that they would advise their

subordinates of the event.  Approximately 33-35 members showed up for the event."  (Id. ¶ 9.)

Halverson continues: "Personnel who attended the organizational day were subject to military discipline

in the same manner as if they were at their regular duty station.  Although we were engaging in

recreational activities, I had the authority to discipline anyone who I believed did not engage in

appropriate behavior."  (Id. ¶ 10.)  Halverson states that he recalls "speaking to the staff about several

safety issues outlined in the Op. Order."  (Id. ¶ 11.)  Halverson's affidavit also recounts that he gave

permission for some participants to leave early but those who remained were still under duty status.

(Id. ¶ 15.)  He states that after a formal military investigation of "Operation Flotilla" he was issued a

formal letter of reprimand.  (Id. ¶ 17.)

Brigadier General Trost, who was not present at the July 3, 2002 event, also filed an affidavit.

He also states that "Operation Flotilla" was an organizational day.  (Id. Ex. B ¶ 3.)  According to Trost,

"Colonel Halverson and Major L. Wehking, by participating in the organizational day, were acting in

furtherance of the [Minnesota National Guard's] interests in holding an organizational day."  (Id. ¶ 4.)

Trost concludes, "The July 3, 2002 boating accident occurred substantially within the time and area set

for the organizational day."  (Id. ¶ 6.)

The parties agree that four factors are considered when determining whether an employee's

conduct was within the scope of his employment: (1) the employee's conduct was substantially within

work related limits of time and place; (2) the employee's conduct is of a kind authorized by the

employer or reasonably related to that employment; (3) the employee's act was motivated at least in

part by the employee's desire to further the employer's interests; and (4) the employer should have

foreseen the employee's conduct, given the nature of the employment and the duties relating to it.

(Doc. No. 22 at 14 and Doc. No. 28 at 3 in Egbertson I.)

The United States contends that the above statements show that Halverson and Wehking: (1)

acted in furtherance of the interests of the Army National Guard to bolster morale and enhance

communication; (2) engaged in conduct of the kind they were authorized to perform, namely, scheduling

an organizational day filled with recreational events; (3) engaged in the authorized activity substantially

within the authorized time (8:00 a.m. through 4:00 p.m.) and space (on or near the St. Croix River);

and (4) Halverson's and Wehking's conduct and the boat collision on July 3, 2002 was foreseeable.

(Doc. No. 28 at 3-6 in Egbertson I.)  Based upon the above, the United States argues that its

certification that Halverson and Wehking acted within the scope of their employment was warranted.

13

Plaintiffs in Egbertson I and Wehking I argue that there arguably exist a number of disputed facts that undermine the United States' certification and which warrant further discovery. For example, Plaintiffs argue that a "normal duty day" for such an event would have included a safety briefing. In his affidavit, and in contrast to Halverson's affidavit, Wehking states, "[n]o safety briefing occurred on July 3, 2002." (Id. ¶ 10.) Additionally, unlike Halverson, Wehking states, "[a] normal duty day would have required the issuance of passes and the granting of official leave for this type of activity" (Id. ¶ 11) but indicates that no passes were issued and no official leave was granted to those participating in the event. (Id. ¶ 12.) Wehking's affidavit also brings into question whether the "operational order" as Halverson calls the "Operation Flotilla" document, was formally distributed to all FTS staff as Halverson claims. Wehking states, "Copies of the 'Order' announcing the event were not distributed to all personnel invited to the party. Instead the Order was informally distributed. To the best of my knowledge only about eight people received the Order." (Id.) Further, Plaintiffs contend that a "normal duty day" included roll call and attendance and cite in support the affidavit of Major Wehking. (Doc. No. 16 ¶ 6 in Egbertson I.) The United States does not specifically respond to this contention.

Plaintiffs also argue that the "authorized conduct" inquiry concerns not the scheduling of the organizational day as the the United States claims, but the "negligent operation of a boat after a day of drinking and partying." (Doc. No. 22 at 15 in Egbertson I.)

Moreover, Plaintiffs assert that there are conflicting reports of when the "organizational day" began and ended. Plaintiffs argue that the fact that only 13 of the 40 participants arrived at 8:00 a.m. suggests the time frame indicated in the "Operation Flotilla" document was not an order but a party invitation. Their argument is bolstered by the "Operation Flotilla" document itself which indicates that

14

only those who "desire[d] to participate in a 40-minute morning run" needed to present themselves at 8:00 a.m. (Doc. No. 28 Ex. C in Egbertson I.) In further support of their position they cite the affidavit of Major Wehking, the person who drafted the operational order (Doc. No. 16 ¶ 8 in Egbertson I). Wehking states, "participation was mandatory only until the group left Colonel Halverson's house. At that time (1100), soldiers understood they were free to leave and some did." (Id. ¶ 14.) Wehking further states that "Colonel Halverson exercised no control or oversight with regard to the remaining personnel after approximately 11:00 a.m. Colonel Halverson explicitly clarified that in light of the approaching July 4, 2002 weekend, personnel were free to leave as noted above." (Id. ¶ 15.)

Finally, Plaintiff in Egbertson I contends that her pre-suit investigation of the issues pertinent to the scope of employment issue was "sorely hampered by redactions from the materials she received from the Department of Army in response to a Freedom of Information Act request." (Doc. No. 22 at 10 in Egbertson I.) She asserts that she will be able to provide more supporting evidence and a more comprehensive argument for her position that Halverson and Wehking were not acting within the scope of their employment if she is given an opportunity to conduct discovery. (Id. at 9-10.)

### B.   Incident to Service

The United States sets forth four primary reasons that everyone involved in the boat crash was acting "incident to [military] service" at the time it occurred because: (1) "Operation Flotilla" was a military "organizational day" intended as a "team-building event" and designed to recognize the efforts and maintain and improve the morale of the full-time staff of the Minnesota National Guard; (2) the attendees were paid their regular duty pay for the day; (3) the attendees were subject to the same military discipline at the off-site location that they would have been subject to if they had been at their

regular duty station; and (4) the recreational activities they were enjoying on July 3, 2002 were a benefit of their status as service members.  (See Doc. No. 10 at 12-15 and Doc. No. 18 at 7-11 in Amundson II.)  In support of these contentions, the United States cites a declaration of a Colonel Wayne Hayes (Hayes), the acting Chief of Staff of the Minnesota National Guard.  (Doc. No. 10 ¶ 1 in Egbertson I.)  Plaintiffs contend, and the United States concedes, that Hayes was not present for "Operation Flotilla" but based his statements on a review of the information and documents maintained by the Minnesota National Guard.  (Doc. No. 18 at 7 in Amundson II.)  Hayes' affidavit supports, in many aspects, the statements of Trost and Halverson enumerated above in the Court's summary of the parties' positions on the scope of employment issue.  Hayes states that "Halverson directed that an organizational day take place on Wednesday, July 3, 2002 for all full-time members of his staff involved in preparing for a scheduled deployment to Bosnia."  (Id. ¶ 4.)  Hayes states that an "organizational day" is "not uncommon in the Army" and is a "normal duty day."  (Id. ¶ 5.)  Hayes states that the events of July 3, 2002 were "scheduled during the regular duty day and [were] scheduled to last from 8:00 a.m. to 4:00 p.m."  (Id. ¶ 7.)  According to Hayes, "All  full-time personnel assigned to the Division Headquarters were expected to attend the event. . . . Personnel who attended the organizational day were subject to military discipline in the same manner as if they were at their regular duty station."  (Id. ¶ 7-8.)

    While the legal analysis differs, the parties also cite many of the same additional facts in support and in opposition to the "incident to service determination" that they cite in support and in opposition to the United States' determination that Halverson and Wehking were acting within the scope of their government employment, as discussed above.

## III.     DISCUSSION

### A.     <u>Defendants' Motions for Substitution and Plaintiff Egbertson's and Michael and Kathy Wehking's Motion for Review of U.S. Attorney's Certification, for Discovery, and/or for an Evidentiary Hearing, and for Remand</u>

The exclusive remedy for damages resulting from the negligence of employees of the United States committed while within the scope of their employment is an action against the United States under the FTCA.  <u>See</u> 28 U.S.C. §§ 2672, 1346(b).  Here, Egbertson and the Wehkings concede that Colonel Halverson and Major Wehking were federal employees in July of 2002.  (<u>See</u> Doc. No. 20 at 12 in <u>Egbertson I</u>.)  Further, the United States certifies that Halverson and Wehking were acting within the scope of their employment pursuant to 28 U.S.C. § 2679(d)(1).  That statute provides:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).  In the Eighth Circuit, certification establishes a rebuttable presumption that the employees were acting within the scope of their employment:

> The government's certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee" and is subject to judicial review.  <u>Gutierrez de Martinez v. Lamagno</u>, 515 U.S. 417, 434 (1995); <u>see also</u> <u>Brown v. Armstrong</u>, 949 F.2d 1007, 1011 (8th Cir. 1991).  Because the certification is prima facie proof that the challenged conduct was within the scope of employment, the burden is on the plaintiff to come forward with specific facts to rebut it.  <u>Brown</u>, 949 F.2d at 1012.

<u>McAdams v. Reno</u>, 64 F.3d 1137, 1145 (8th Cir. 1995).  "If the court finds that the employee was acting outside the scope of his or her employment, the court must refuse to substitute the United States.  If the court agrees with the certification, then the case proceeds against the United States under the

FTCA."  Anthony v. Runyon, 76 F.3d 210, 213 (8th Cir. 1996) (citations omitted).

Egbertson and the Wehkings request that the Court either reject the United States' certification or grant them the opportunity to conduct discovery to rebut the certification.  A plaintiff must present some specific evidence challenging certification before a court will grant discovery and an evidentiary hearing concerning a scope of employment certification.  See Forrest City Mach. Works, Inc. v. United States, 953 F.2d 1086, 1088 (8th Cir. 1992).  In other words, Egbertson and the Wehkings must present some specific evidence that material facts concerning the scope of Halverson's and Wehking's employment are in dispute before discovery will be permitted.

What facts are material to the scope of employment determination depends on the elements of the substantive law applicable to scope of employment determinations.  The parties here agree that Minnesota law applies.  (See Doc. No. 22 at 13 and Doc. No. 28 at 3 in Egbertson I.)  Under Minnesota law, "No hard and fast rule can be applied to resolve the 'scope of employment' inquiry. Rather, each case must be decided on its own individual facts."  Edgewater Motels, Inc. v. Gatzke, 277 N.W.2d 11, 15 (Minn. 1979).  Factors relevant in determining whether the employee's action or omission was within the scope of his employment include whether: (1) the employee's conduct was substantially within work related limits of time and place; (2) the employee's conduct is of a kind authorized by the employer or reasonably related to that employment; (3) the employee's act was motivated at least in part by the employee's desire to further the employer's interests; and (4) the employer should have foreseen the employee's conduct, given the nature of the employment and the duties relating to it.  Murray v. United States, 258 F. Supp. 2d 1006, 1012 (D. Minn. 2003) (citing 4 Minnesota Practice Series, Jury Instruction Guides CIVSVF 30.15 (4th ed. 1999) and Edgewater

Motels, 277 N.W.2d at 15), aff'd, 381 F.3d 810 (8th Cir. 2004); see also Hentges v. Thomford, 569

N.W.2d 424, 428 (Minn. 1997).

Given the above factors, the Court finds that Egbertson and the Wehkings have presented

sufficient specific evidence to warrant further discovery.  For example, Major Wehking's affidavit raises

material facts that, at this stage, appear to contradict facts the United States relies on to argue that at

least the first two of the four factors enumerated above are met.  Many of the fact disputes raised by

Major Wehking's affidavit concerning the time, location, and nature of the activities on July 3, 2002 are

also supported by the affidavits of Amundson, Berg, and MacDonald. submitted in opposition to the

United States' Motion to Dismiss.  Finally, Egbertson and the Wehkings, by adoption of Egbertson's

arguments, argue that their pretrial discovery efforts were hampered by significant redactions of reports

and statements relevant to resolving the scope of employment issue made by the United States in

response to a FOIA request.  (Doc. No. 22 at 9 in Egbertson I.)  Under the circumstances, the Court

finds that a just determination of whether Halverson and Wehking were acting within the scope of their

employment requires additional fact finding.  Therefore, the Court recommends granting Egbertson's

and the Wehkings' request for additional discovery concerning whether Halverson and Wehking were

acting within the scope of their employment on July 3, 2002.  The Court recommends denying without

prejudice the remainder of the relief requested by Egbertson and the Wehkings in their Motions for

Review of U.S. Attorney's Certification, for Discovery and/or for an Evidentiary Hearing, and for

Remand (Doc. No. 20 in Egbertson I; Doc. No. 10 in Wehking I.)  For the same reasons, the Court

recommends denying without prejudice Defendants' Motions for Substitution (Doc. No. 2 in Egbertson

I; Doc. No. 2 in Wehking I.)

**B.**     **United States' Motions to Dismiss**

**1.     Standard of Review**

Defendants challenge the Court's jurisdiction to hear the above-captioned matters pursuant to Federal Rule of Civil Procedure 12(b)(1).  A motion to dismiss is either a facial or factual attack on a plaintiff's allegations.  Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993).  In a facial challenge, the defendant contends that the complaint fails to allege an element necessary for subject matter jurisdiction.  Id.  Therefore, the reviewing "court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)."  Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).  In other words, "all of the factual allegations are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction."  Titus, 4 F.3d at 593.

In a factual challenge, the defendant attacks, not the failure of the plaintiff to allege a necessary element of a claim, but the truthfulness of the allegations themselves and supports his attack by submitting evidence not contained in the complaint.  Id.  Therefore,

> no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

Osborn, 918 F.2d at 730 (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  Yet, "[d]ismissal for lack of subject matter jurisdiction will not be granted lightly." Wheeler v. St. Louis S.W. Ry. Co., 90 F.3d 327, 329 (8th Cir. 1996).  A court has the authority to consider matters outside the pleadings when subject matter jurisdiction is challenged.  Osborn, 918

F.2d at 728 n.4.  Consideration of matters outside the pleadings, alone, does not convert a motion to dismiss for lack of subject matter jurisdiction into a summary judgment motion.  <u>Harris v. P.A.M. Transport, Inc.</u>, 339 F.3d 635, 637 n.4 (8th Cir. 2003).

> If the defendant thinks the court lacks jurisdiction, the proper course is to request an evidentiary hearing on the issue.  The motion may be supported with affidavits or other documents.  If necessary, the district court can hold a hearing at which witnesses may testify.

<u>Osborn</u>, 918 F.2d at 730 (citing <u>Crawford v. United States</u>, 796 F.2d 924, 928-29 (7th Cir. 1986) (Posner, J.)); <u>see also</u> Fed. R. Civ. P. 43(e) ("When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition.").

In fact, "[a]s there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court."  <u>Gibbs v. Buck</u>, 307 U.S. 66, 71-72 (1939), <u>quoted in</u> <u>Zunamon v. Brown</u>, 418 F.2d 883, 886 (8th Cir. 1969); <u>see also</u> <u>Osborn</u>, 918 F.2d at 730 ("As no statute or rule prescribes a format for evidentiary hearings on jurisdiction, 'any rational mode of inquiry will do.'" (quoting <u>Crawford</u>, 796 F.2d at 929)).

> The scope of the pre-trial jurisdictional inquiry must of necessity turn upon the specific pleadings and facts involved in each particular case.  Yet in resolving the question of the appropriateness of jurisdiction as measured by the legal certainty of plaintiff's claim, all doubts should be resolved by the district court in favor of allowing a plenary trial rather than a peremptory 'trial' under the guise of an evidentiary jurisdictional hearing.

<u>Zunamon</u>, 418 F.2d at 886.

"Once the evidence is submitted, the district court must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue."  <u>Osborn</u>, 918 F.2d at

730 (citing and quoting <u>Crawford</u>, 796 F.2d at 929).  "The only exception is in instances when the

jurisdictional issue is 'so bound up with the merits that a full trial on the merits may be necessary to

resolve the issue.'" <u>Id.</u> (quoting <u>Crawford</u>, 796 F.2d at 929 (citing <u>Augustine v. United States</u>, 704

F.2d 1074, 1077-78 (9th Cir. 1983)).  That is, "'[w]here the jurisdictional issue . . . cannot be decided

without the ruling constituting at the same time a ruling on the merits of the case, the case should be

heard and determined on its merits through regular trial procedure.'" <u>Zunamon</u>, 418 F.2d at 886

(<u>quoting</u> <u>Fireman's Fund Ins. Co. v. Ry. Express Agency, Inc.</u>, 253 F.2d 780, 784 (6th Cir. 1958)).

"[T]he decision should," instead, "await a determination of the merits either by the district court on a

summary judgment motion or by the fact finder at trial."  5B Wright & Miller, <u>Federal Practice and</u>

<u>Procedure</u> § 1350, at 246-49 (Civil 3d 2004), <u>cited by</u> <u>Augustine</u>, 704 F.2d at 1077 ("[W]here the

jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent

on the resolution of factual issues going to the merits, the jurisdictional determination should await a

determination of the relevant facts on either a motion going to the merits or at trial."); <u>Collins v. Central</u>

<u>States</u>, 820 F. Supp. 1194, 1196 (D. Neb. 1993), <u>aff'd</u>, 18 F.3d 556 (8th Cir. 1994).  "In such a

case, where the jurisdictional issue is dependent upon the resolution of factual issues going to the merits,

a court applies the summary judgment standard."  <u>C.R.S. v. United States</u>, 761 F. Supp. 665, 666-67

(D. Minn. 1991) (Doty, J.) (converting the United States' 12(b)(1) motion based upon the <u>Feres</u>

doctrine to a motion for summary judgment because "an ultimate determination of the jurisdictional issue

depend[ed] on the facts developed as to the merits of plaintiffs' claims").  "Unless [the summary

judgment] standard is met, the jurisdictional facts must be determined at trial by the trier of fact."

<u>Augustine</u>, 704 F.2d at 1077.

> [N]umerous federal courts have recognized that when subject matter jurisdiction is dependent on the same statute that forms the basis of the underlying claim, the jurisdictional question is tied up with the merits of the case. Therefore, it should not be decided on a motion to dismiss but may be appropriate for summary judgment.

5B Wright & Miller, Federal Practice and Procedure § 1350, at 246-49 (Civil 3d Supp. 2005) (citing Montez v. Dept. of Navy, 392 F.3d 147 (5th Cir. 2004) (finding that the use of the Rule 12(b)(1) standard was "improper" and a Rule 12(b)(6) or summary judgment standard should have been applied because the government's jurisdictional attack against the plaintiff's FTCA negligence claim—that the allegedly negligent member of the Navy was not acting within the scope of his employment—was "intertwined with the merits of [plaintiff's] FTCA claim [and] should [have been] treated like any other intertwined attack"); Martinez v. United States, 311 F. Supp. 2d 1274, 1276-77 (D.N.M. 2004) (construing a Rule 12(b)(1) motion as a summary judgment motion where both the "jurisdiction and substantive issues" were "dependent on the same statutes and [were] inextricably intertwined"); see also Pringle v. United States, 208 F.3d 1220, 1223 (10th Cir. 2000) (finding that the Feres doctrine, although "judge-made law," was the product of "statutory construction of the FTCA" and, thus, Rule 12(b)(1) motions brought pursuant to Feres could be converted to Rule 12(b)(6) or summary judgment motions if the "resolution of the jurisdictional question requires resolution of an aspect of the substantive claim").

When presented with a summary judgment motion, a Court "may refuse the application for [summary] judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just" when "it appears from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit

facts essential to justify the party's opposition."  Fed. R. Civ. P. 56(f).

### 2.      The FTCA and the <u>Feres</u> Decision

According to the judicially recognized doctrine of sovereign immunity, "the United States

cannot be sued without its consent."  <u>Fed. Housing Admin. v. Burr</u>, 309 U.S. 242, 244 (1940).  In

1946, Congress enacted the Federal Tort Claims Act (FTCA), now codified at 28 U.S.C. §§ 1346(b),

2671-2680 (2000), which authorized tort suits for money damages brought against the United States,

with some exceptions.[6]  The FTCA affords exclusive jurisdiction to federal district courts of civil actions

on claims against the United States

> for money damages . . . for injury or loss of property, or personal injury or death caused
> by the negligent or wrongful act or omission of any employee of the Government while
> acting within the scope of his . . . employment, under circumstances where the United
> States, if a private person, would be liable to the claimant in accordance with the law of
> the place where the act or omission occurred.

28 U.S.C. § 1346(b) (2000).

In <u>Feres v. United States</u>, however, the United States Supreme Court held that, despite not

being explicitly excepted by Congress in the FTCA, the United States cannot be held liable under the

FTCA for injuries to military personnel which arise out of or in the course of activity incident to military

service.  340 U.S. 135, 146 (1950).  According to the <u>Feres</u> Court, the "incident to service exception"

results from construing the FTCA "to fit, so far as will comport with its words, into the entire statutory

scheme of remedies against the Government to make a workable, consistent and equitable whole."  <u>Id.</u>

at 139.  The Court gave three reasons, all grounded in statutory construction of the FTCA, for its

---

[6] <u>See</u> 28 U.S.C. § 2680.

24

conclusion.  First, the Court determined that jurisdictional language of the FTCA (cited above) was limited by another provision of the Act which allows liability only "to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  The Court found that "no American law . . . permitted a soldier to recover for negligence against either his superior officers or the Government he is serving" nor was "there any liability 'under like circumstances,'" because "no private individual has the power to conscript or mobilize a private army with such authorities as the Government."  Thus, the Court concluded that servicemen claims "incident to service" did not fit the definition of an allowable FTCA claim.  Id. at 141.  Second, the Court noted that under the FTCA "the law of the place where the act or omission occurred" governed liability.  The provision seemed "fair" to the Court when applied to persons who could choose their "habitat," but made "no sense" when applied to soldiers who had to go wherever the United States told them to go in any of the United States.  That is, according to the Court, "the geography of a [soldier's] injury" should not select the tort law to be applied.  Finally, the Court found it significant that the United States already provided a "simple, certain, and uniform compensation" system for soldiers and the FTCA did not address how the system would affect a soldier's entitlement under that system.

The Supreme Court later identified three rationales for the Feres decision:

First, the relationship between the Government and members of its Armed Forces is " 'distinctively federal in character,' " id., at 143, 71 S.Ct., at 158, citing United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); it would make little sense to have the Government's liability to members of the Armed Services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury.

Second, the Veterans' Benefits Act establishes, as a substitute for tort liability, a statutory "no fault" compensation scheme which provides generous pensions to injured servicemen, without regard to any negligence attributable to the Government.

25

A third factor was explicated in United States v. Brown, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954), namely, "(t)he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty . . . ."

Stencel Aero Engineering Corp. v. U. S., 431 U.S. 666, 671-672 (1977).  The Eighth Circuit has stated that "[t]he most compelling rationale for the Feres doctrine clearly is the potential effect of civil suits on the military disciplinary structure."  Brown v. United States, 739 F.2d 362, 365 (8th Cir. 1984.)  A "flexible analysis" is employed "to determine whether the facts in [a] case fall within the reasons given by the Supreme Court for its principle of military immunity in Feres."  Id. at 367.  There are, however, "various factors that should usually be considered in determining whether an activity is incident to service."  Id.  For example, courts look at: "(1) whether there is a relevant relationship between the service member's activity and the military service," which can usually be determined by examining (a) the duty status of the service member when the negligent act occurred, (b) the situs of the negligent act and/or injury, (c) the nature of the activity at the time the negligent act occurred; "(2) whether military discipline will be impeded if the challenged conduct is litigated in a civil action; and (3) whether the service member, "at the time of injury, [was] enjoying a benefit because of [his] status as" an employee of the military.  Id. at 367-68.

The conclusions drawn from the application of the above factors are extremely fact sensitive. The Court finds that the factual disputes discussed above concerning the scope of employment of Halverson and Wehking are closely related to an analysis of each of the three factors the court must consider to determine if the injuries to the plaintiffs in the above-captioned cases arose out of or in the course of activity incident to their military service.  For example, the United States cites a number of

26

cases where courts have applied the <u>Feres</u> doctrine to bar suits against the government where the negligent conduct arises in the course of recreational activities:

> <u>See, e.g.</u>, <u>Lauer v. United States</u>, 968 F.2d 1428 (1st Cir.) (service member injured while walking to off-post bar), <u>cert. denied</u>, 506 U.S. 1033 (1992); <u>Potts v. United States</u>, 723 F.2d 20 (6th Cir. 1983) (soldier injured while returning in naval landing craft from shore leave), <u>cert. denied</u>, 466 U.S. 959 (1984); <u>Walls v. United States</u>, 832 F.2d 93 (7th Cir. 1987) (service member injured in airplane crash during recreational flying); <u>Herreman v. United States</u>, 476 F.2d 234 (7th Cir. 1973) (National Guard member injured in plane crash while flying home on military plane for social visit); <u>Bon v. United States</u>, 802 F.2d 1092 (9th Cir. 1986) (armed services member injured in boating accident); <u>Millang</u>, 817 F.2d 533 (9th Cir. 1987) (military policeman run over by another military policeman while off duty), <u>cert. denied</u>, 487 U.S. 1218 (1988); <u>Uptegrove v. United States</u>, 600 F.2d 1248 (9th Cir. 1979) (<u>Feres</u> bars FTCA claim by survivor of service member who died in crash of military airplane on which he was a "military space available" passenger headed home on leave), <u>cert. denied</u>, 444 U.S. 1044 (1980); <u>Pringle v. United States</u>, 208 F.3d 1220 (10th Cir. 2000)(soldier injured after being ejected from military MWR club); <u>Degentesh v. United States</u>, 230 F. Supp. 763 (N.D. Ill. 1964)(death of service man on route in tractor-trailer to recreational party off base); <u>Keisel v. Buckeye Donkey Ball, Inc.</u>, 311 F. Supp. 370 (E.D. Va. 1970)(injuries sustained in "donkey softball game" deemed incident to service.

(Doc. No. 9 at 9 in <u>Egbertson I</u>.)  But Plaintiffs contend that "virtually all" of the above cases "involve recreational activities that were available to the service person only because of his status with the military" such as "accidents in military swimming pools, access to military clubs, military run stables, or access to military transportation" or "military hospitals."  (Doc. No. 15 at 20 in <u>Egbertson I</u>.)  Further, the United States argues that the "organizational day, although recreational in nature, was a normal duty day and served distinct military purposes."  (Doc. No. 9 at 13 in <u>Egbertson I</u>.)  But Plaintiffs counter that the current facts show:

> No military business was enacted or discussed that day.  Roll call did not occur and attendance was not taken.  Participants came and went as they chose.  Multiple military rules were intentionally and knowingly violated, not the least of which was the consumption of alchohold during the entire day.  The activities occurred in public places and used

> personal or public facilities.  The organized portion of the party was long over at the time
> of the accident.

(Doc. No. 15 at 21 in <u>Egbertson I</u>.)  Some of these disputes may be real and others illusory, but

Plaintiffs have provided enough evidence to justify their request for further discovery.  A review of the

United States' cases and Plaintiffs' attacks on them underscores the importance of having a complete

record of the factual underpinnings of the motion to dismiss for lack of subject matter jurisdiction.  The

Court finds that the current record is insufficient for the Court to issue a ruling under either Rule

12(b)(1) or Rule 56.  Further, the resolution of Defendants' motions is mired in the complex

relationship between the jurisdictional issues raised by the United States and Plaintiffs' underlying

substantive claims.  Given all of the above, the Court's affirmative obligation to resolve this matter justly

pursuant to Federal Rule of Civil Procedure 1 dictates that Defendants' motions be considered only

after further discovery of the "incident to service" and scope of employment issues.

Therefore, the Court recommends denying without prejudice Defendants' Motions to Dismiss

(Doc. No 7 in <u>Egbertson I</u>; Doc. No. 8 in <u>Egbertson II</u>; Doc. No. 6 in <u>Wehking I</u>; Doc. No. 8 in

<u>Amundson II</u>; Doc. No. 5 in <u>Wehking II</u>).

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1.      In <u>Egbertson v. Halverson, et al.</u>, Civ. No. 05-466:

        a.      Defendants' Motion for Substitution (Doc. No. 2) be **DENIED without prejudice**;

        b.      Defendants' Motion to Dismiss (Doc. No. 7) be **DENIED without prejudice**.

        c.      Plaintiff's Motion for Review of U.S. Attorney's Certification, for Discovery, and/or for an Evidentiary Hearing, and for Remand (Doc. No. 20) be **GRANTED in part and DENIED in part without prejudice** as set forth herein;

2.      In <u>Egbertson v. United States</u>, Civ. No. 04-5066, Defendants' Motion to Dismiss (Doc. No. 8) be **DENIED without prejudice**;

3.      In <u>Wehking et. al. v. Halverson</u>, Civ. No. 05-863:

        a.      Defendants' Motion for Substitution (Doc. No. 2) be **DENIED without prejudice**;

        b.      Defendants' Motion to Dismiss (Doc. No. 6) be **DENIED without prejudice**; and

        c.      Plaintiff's Motion for Review of U.S. Attorney's Certification, for Discovery, and/or for an Evidentiary Hearing, and for Remand (Doc. No. 10) be **GRANTED in part and DENIED in part without prejudice** as set forth herein;

4.      In <u>Amundson et. al. v. United States</u>, Civ. No. 05-004, Defendants' Motion to Dismiss (Doc. No. 8) be **DENIED without prejudice**;

5.      In <u>Wehking et. al v. United States</u>, Civ. No. 05-070, Defendants' Motion to Dismiss (Doc. No. 5) be **DENIED without prejudice**; and

6.      The Clerk of Court be instructed to docket the district court's Order disposing of the motions referenced herein in each of the above-captioned cases.  The Clerk of Court shall docket this report and recommendation in each of the above-captioned cases.

7.      The parties be ordered to, without delay, commence discovery, using any means authorized by the Federal Rules of Civil Procedure, limited to the scope of employment and "incident to service" issues discussed herein and in the parties' briefs.

Dated: August 31, 2005

     s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by <u>September 19, 2005</u>, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.